## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RICHARD DOUGLAS ET AL.**                              CIVIL ACTION

**VERSUS**                                                         No. 17-2305

**MATTHEW DEPHILLIPS ET AL.**                          SECTION I

## ORDER AND REASONS

In March 2016, Joshua Douglas led law enforcement officers on a car chase through the streets of St. Tammany Parish. By the end of it, he was dead as a result of an officer's use of force. This case is about whether such use of force, and other actions taken by officers at the time, violated the U.S. Constitution and Louisiana law.

Defendants have filed a joint motion[1] to dismiss all of plaintiffs' claims in the amended complaint ("complaint").[2] Because plaintiffs untimely filed their opposition, the Court could have treated the motion as unopposed.[3] The Court nevertheless read

---

[1] R. Doc. No. 30. All defendants have joined the joint motion to dismiss.

[2] R. Doc. No. 25. The amended complaint references exhibits that were attached to the original complaint. *See, e.g.*, *id.* at 3 nn.1-2. The Court treats the amended complaint as incorporating those exhibits. *See* Fed. R. Civ. P. 10(c).

[3] On September 13, 2017, plaintiffs requested an extension of time to file an opposition to the motion. R. Doc. No. 34. The Court granted the motion and extended the deadline to September 20, 2017. R. Doc. No. 36. Plaintiffs failed to file an opposition by the extended deadline. Plaintiffs then represented to the Court that an opposition would be filed by September 21, 2017. R. Doc. No. 38. The Court informed plaintiffs that it would treat defendants' motion as unopposed unless an opposition was filed on September 21, 2017. *Id.* Plaintiffs filed their opposition on the afternoon of September 22, 2017. *See* R. Doc. No. 39; R. Doc. No. 40. The Court also notes that plaintiffs purport to incorporate by reference their opposition to defendants' prior motion to dismiss. *See* R. Doc. No. 39, at 5. The Court strongly disfavors this tactic.

plaintiffs' untimely filings and considered the arguments presented therein.  For the following reasons, the Court grants defendants' joint motion to dismiss.

## I.

At approximately 5:00 pm on March 19, 2016, a National Crime Information Center camera detected a license plate that had been reported stolen.[4]  The license plate was attached to a silver, four-door Infiniti sedan.[5]

The camera relayed the detection to the St. Tammany Parish sheriff's office ("Sheriff's Office"), whose dispatch alerted officers to the sighting.[6]  Deputy James Kelly responded.[7]  At the time, Deputy Kelly was in a "fully-marked" cruiser.[8]

Deputy Kelly spotted the Infiniti near the intersection of Interstate 12 and Highway 59 "[a]lmost immediately."[9]  Deputy Kelly noticed a male driver, later identified as Joshua Douglas ("Douglas").[10]  Jessica Sheppard ("Sheppard") was also in the Infiniti, sitting in the front passenger seat.[11]  Deputy Kelly turned on his

---

*Cf. Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (5th Cir. 2003) ("Stewart . . . invites us to unearth its arguments lodged here and there in the joint appendix, leaving it to us to skip over repetitive material, to recognize and disregard any arguments that are now irrelevant, and to harmonize the arguments in the various documents.").

[4] R. Doc. No. 25, ¶ 5.

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* ¶ 6.

[10] *Id.*

[11] *Id.*

cruiser's emergency lights and began to pursue the Infiniti on the basis of the stolen license plate.[12]  Douglas refused to stop.[13]

Deputy Kelly pursued Douglas north on Highway 59.[14]  Douglas then took a series of turns, eventually ending up on 3rd Avenue.[15]  From 3rd Avenue, Douglas entered "the dead-end square of Judy Avenue to the north, Barbara Avenue to the south, Bode Avenue to the east, and Janice Avenue to the west."[16]

Deputy Kelly stopped on 3rd Avenue, and was joined by Deputies Matthew DePhillips and Jacob Jenkins, who drove their own "fully-marked" vehicles. [17] Deputies Kelly, DePhillips, and Jenkins then drove into the square to pursue Douglas.[18]  Deputies Kelly and Jenkins went south on Janice Avenue; Deputy DePhillips went east on Judy Avenue.[19]  After Deputy DePhillips turned from Judy Avenue onto Bode Avenue, he encountered Douglas, who was driving the Infiniti in reverse down Bode Avenue at a "high rate of speed."[20]  The complaint suggests that Douglas may have struck one or more of the deputies' vehicles in the process, although in no "appreciable manner."[21]

---

[12] *Id.*
[13] *Id.* ¶ 7.
[14] *Id.* ¶ 8.
[15] *Id.*
[16] *Id.*  For a visual, see the Appendix.
[17] R. Doc. No. 25, ¶¶ 9-11.
[18] *Id.* ¶ 13.
[19] *Id.*
[20] *Id.* ¶ 14 (internal quotation marks omitted).
[21] *See id.* ¶ 14 n.11.

Douglas then backed the Infiniti into a ditch on Bode Lane, which "juts out like a scorpion's tail" from the corner of Bode and Barbara Avenues.[22]  The Infiniti's driver's side was leaning against the embankment, which allegedly prevented Douglas from being able to exit the Infiniti through the driver's door.[23]

Deputies DePhillips, Kelly, and Jenkins pulled up to Bode Lane.[24]  The three officers left their vehicles and "rushed" the Infiniti with firearms drawn.[25]  Deputy DePhillips "positioned himself at the rear passenger door," Deputy Kelly at the front passenger door, and Deputy Jenkins at the passenger side front fender.[26]  The time was on or about 5:12 pm, and the weather was clear with "sufficient natural daylight."[27]

As the officers positioned themselves, Sheppard's hands were "in the air," and Sheppard was screaming that she was pregnant.[28]  Douglas "put his hand(s) near the top" of Sheppard's arms.[29]  Douglas's face was "within inches" of Sheppard's face.[30]

Deputy DePhillips opened the Infiniti's rear passenger door and "immediately fired one shot" with his firearm, hitting Douglas near his right eye.[31]  According to the complaint, "Deputy DePhillips claimed with certainty that he assessed and

---

[22] *Id.* ¶¶ 13, 15.
[23] *Id.* ¶ 15.
[24] *Id.* ¶ 16.
[25] *Id.* ¶ 17.
[26] *Id.* ¶ 18.
[27] *Id.* ¶¶ 12, 17 (internal quotation marks omitted).
[28] *Id.* ¶ 18.
[29] *Id.* ¶
[30] *Id.* ¶ 19.
[31] *Id.*

concluded . . . that he believed" Douglas had a firearm in his hand, which was hidden underneath Sheppard's hair.[32]  No firearm was recovered from the scene.[33]

After Deputy DePhillips discharged his firearm at Douglas, Deputy Jenkins removed Sheppard from the Infiniti as Sargent [34] Alex Dantaghan and Deputy Cristen Graham arrived on the scene.[35]  Deputy Jenkins allegedly "threw" Sheppard face-down on the ground, and then either he or Deputy Graham handcuffed her and placed her in the back seat of his vehicle.[36]

Paramedics arrived twelve to fourteen minutes later.[37]  Deputy Graham recalled that the paramedics "'came out after' the scene was 'declared safe.'"[38]  One of the paramedics "checked [Douglas's] pulse with an EKG patch on his right arm, consulted with a physician, and declared death."[39]  According to the complaint, an examination of Douglas's body after these events suggests that Douglas lived for some time after he had been shot.[40]

In addition to checking Douglas, the paramedics attended to Sheppard, who was transported to Lakeview Regional Medical Center ("Lakeview") at approximately

---

[32] *Id.* ¶ 37.  The complaint notes that the St. Tammany Parish District Attorney did not press charges against Deputy DePhillips.  *Id.* ¶ 39.
[33] *Id.* ¶ 37.
[34] The complaint uses the spelling "Sargent."
[35] *Id.* ¶¶ 21, 24, 26.
[36] *Id.* ¶ 23.
[37] *See* R. Doc. No. 1-1, at 3.
[38] R. Doc. No. 25 ¶ 24.
[39] *Id.* ¶ 26.
[40] *Id.* ¶ 25.

5:46 pm.[41]  Deputy Grey Thurman accompanied her.[42]  Both before and until she arrived at Lakeview, Sheppard "repeatedly asked for her purse," which no officer provided to her.[43]

Sheppard arrived at Lakeview around 5:56 pm, where she remained "against her will."[44]  Upon arrival, Sheppard was isolated from the general population.[45]  She chose to end her medical treatment at approximately 8:35 pm.

After ending her treatment, Sheppard gave a statement at the St. Tammany Parish Law Enforcement Center, beginning at 9:48 pm and ending at 10:22 pm.[46]  Sheppard alleges that the statement was "effectively forced."[47]  She was then taken home.[48]

At some point either during or after this incident, law enforcement discovered that the Infiniti driven by Douglas had been stolen.[49]  The St. Tammany Parish sheriff's office returned the Infiniti to its lawful owner before plaintiffs' counsel had an opportunity to inspect it.[50]

In response to these events, plaintiffs filed this lawsuit, alleging over a dozen theories of liability against a dozen defendants.  Defendants now jointly move[51] to

---

[41] *Id.* ¶ 27.
[42] *Id.*  The complaint does not explain when Deputy Thurman arrived at the scene.
[43] *See* R. Doc. No. 1, ¶¶ 27-28.
[44] *Id.* ¶ 27.
[45] *Id.* ¶ 28.
[46] *Id.* ¶ 29.
[47] *Id.*
[48] *Id.*
[49] *Id.* ¶ 18.
[50] *Id.* ¶¶ 34-35.
[51] R. Doc. No. 30.

dismiss all claims against them for failure to state a claim. Defendants also assert qualified immunity as a defense to certain claims.

## II.

### A.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a district court may dismiss a complaint, or any part of it, where a plaintiff has not set forth well-pleaded factual allegations that would entitle him to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). A plaintiff's factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570)).

A facially plausible claim is one where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

On a Rule 12(b)(6) motion to dismiss, a court limits its review "to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010); *see also*

*Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). In assessing the complaint, the Court must accept all well-pleaded factual allegations as true and liberally construe all such allegations in the light most favorable to the plaintiff. *Spivey*, 197 F.3d at 774; *Lowrey v. Tex. A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997).

Where "the complaint 'on its face show[s] a bar to relief,'" then dismissal is the appropriate course. *Cutrer v. McMillan*, 308 Fed. App'x. 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)). Where applicable, qualified immunity can operate as such a bar.

## B.

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In striking this balance, qualified immunity shields "government officials performing discretionary functions" from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.").

Where a public official invokes qualified immunity as a defense to a civil action against him, the plaintiff then has the burden "to demonstrate the inapplicability of

the defense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (citing *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc)). To meet this burden, a plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011) (en banc). "Courts have discretion to decide which prong of the qualified-immunity analysis to address first." *Id.*

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Turner v. Lieutenant Driver*, 848 F.3d 678, 685 (5th Cir. 2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (alteration in original). Once a plaintiff alleges that an official's conduct violated a clearly established right, the court must then determine "whether the official's conduct was objectively reasonable under the law at the time of the incident." *Michalik v. Hermann*, 422 F.3d 252, 258 (5th Cir. 2005); *see also Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001).

An official's conduct is not objectively unreasonable "unless all reasonable officials in the [official's] circumstances would have then known that the [official's] conduct violated the plaintiff's rights." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015). When denying qualified immunity, a court must point to "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Wyatt v. Fletcher*, 718

F.3d 496, 503 (5th Cir. 2013). Precedent existing at the time of the challenged conduct "must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

When the defense of qualified immunity is raised in a motion filed pursuant to Rule 12(b)(6), "it is the defendant's conduct as alleged *in the complaint* that is scrutinized for 'objective legal reasonableness.'" *McClendon*, 305 F.3d at 323 (emphasis in original) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). A court must determine that a plaintiff's pleadings "assert facts which, if true, would overcome the defense of qualified immunity." *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014). The allegations must be pleaded with "sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts." *Clayton v. Columbia Cas. Co.*, No. 11-845, 2012 WL 2952531, at *2-*3 (M.D. La. July 19, 2012) (Africk, J.) (internal quotation marks omitted).

## III.

Plaintiffs assert numerous federal and state law claims against numerous defendants, including: 1) Fourth Amendment claims for use of excessive force, 2) Fourth Amendment claims for unreasonable seizure, 3) a Fourteenth Amendment claim for failure to render medical care,[52] 4) *Monell* claims against the Sheriff of St. Tammany Parish, 5) claims against Sheriff Rodney Jack Strain, Jr. in his individual

---

[52] Plaintiffs are ambiguous as to the constitutional home of an arrestee's right to medical attention. See R. Doc. No. 25, at 27. The Fifth Circuit has held that this right derives from the Fourteenth Amendment. *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 473 (5th Cir. 1996).

capacity, 6) a Fourteenth Amendment claim for "deprivation of [plaintiff Richard Douglas's] right of familial association and parenthood,"[53] 7) survival claims, 8) wrongful death claims, and 9)–13) claims for false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, battery, and intentional spoliation of evidence.[54] With respect to their state law theories, plaintiffs seek to impose both *respondeat superior* liability and joint-and-several liability.[55] Plaintiffs also seek costs and attorney's fees.[56]

Before considering the viability of these claims, the Court must address the issue of standing. Defendants allege that plaintiff Richard Douglas does not have standing to sue on behalf of Douglas, his deceased son.[57] However, a review of the complaint reveals that Richard Douglas does not assert any claims on behalf of Douglas. Rather, the only plaintiff who asserts claims on behalf of Douglas is L.C., on behalf of her minor child, G.D.[58]

---

[53] R. Doc. No. 25, ¶ 54; *see id.* ¶¶ 43-72.

[54] *See id.* ¶¶ 75-99. The complaint could be read to also assert a claim for negligent spoliation of evidence. *See id.* ¶ 99. However, the Louisiana Supreme Court has held that no such claim exists under Louisiana law. *See Reynolds v. Bordelon*, 172 So. 3d 589, 592 (La. 2015) ("[W]e hold that no cause of action exists for negligent spoliation of evidence."). The Court therefore does not read the complaint to assert this claim.

[55] *See* R. Doc. No. 25, ¶¶ 100-06.

[56] *See id.* ¶¶ 73-74.

[57] *See* R. Doc. No. 30-1, at 5-6.

[58] *See generally* R. Doc. No. 25. G.D. is alleged to be Douglas's "only known biological child." *Id.* ¶ 3(b). Under Louisiana's wrongful death and survival statutes, surviving spouses and children have priority over all other classes of plaintiffs to recover damages on behalf of a decedent. *See* La. Civ. C. art. 2315.1 (survival); *id.* art. 2315.2 (wrongful death). "Standing under the Civil Rights Statutes is guided by 42 U.S.C. § 1988, which provides that state common law is used to fill the gaps in administration of civil rights suits." *Pluet v. Frasier*, 355 F.3d 381, 383 (5th Cir. 2004) (citing 42 U.S.C. § 1988(a)). "[A] party must have standing under the state wrongful death or

## IV.

The Court will now turn to whether plaintiffs have successfully pleaded federal law claims against any defendant. The Court will first address Richard Douglas's Fourteenth Amendment claim for "deprivation of [plaintiff Richard Douglas's] right of familial association and parenthood."[59] The Court will then address plaintiffs' *Monell* claims against the Sheriff of St. Tammany Parish and the claims against Sheriff Strain in his individual capacity. Next, the Court will consider the federal law claims at the heart of the case: the Fourth Amendment claims for use of excessive force, the Fourth Amendment claims for unreasonable seizure, and the Fourteenth Amendment claims for failure to render medical care.

## A.

Richard Douglas contends that his son's death has deprived him of his "right of familial association and parenthood in violation of the Fourteenth Amendment."[60] Worded differently, Richard Douglas asserts a federal constitutional right to recover damages for the death of his adult son at the hands of a state actor.[61] To this end, he seeks recovery from Deputies DePhillips, Kelly, and Jenkins.[62] The deputies counter that they are entitled to qualified immunity.

---

survival statutes to bring a claim under 42 U.S.C. §§ 1981, 1983, and 1988." *Id.* As Douglas's surviving child, G.D. has standing to recover damages on behalf of Douglas.
[59] R. Doc. No. 25 ¶ 54.
[60] *Id.*
[61] *Id.* ¶ 53.
[62] *See id.* at 23.

The Court concludes that the deputies are entitled to qualified immunity from Richard Douglas's putative constitutional right. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640) (alterations in original). In short, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*; *see also Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 578 (5th Cir. 2009) ("Qualified immunity shields government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (quoting *Harlow*, 457 U.S. at 818)).

With respect to Richard Douglas's putative constitutional right, neither the U.S. Supreme Court nor the Fifth Circuit has held that such a right exists. *See Irvin v. Foti*, No. 99-1526, 2000 WL 280026, at *4 (E.D. La. Mar. 13, 2000) (Duval, J.) ("[N]either the Supreme Court nor the Fifth Circuit has directly addressed the issue of whether the parent of an adult child has a cause of action under section 1983 for injury to the [Fourteenth Amendment] right of intimate association with that child."); *see also Bedingfield v. Deen*, No. 09-369, 2011 WL 3206872, at *15-*16 (W.D. La. July 27, 2011) (Hicks, J.) (same). In other words, the "constitutional question"—whether the Fourteenth Amendment protects the relationship between a parent and his adult child from state intrusion—is far from "open and shut." *Irvin*, 2000 WL 280026, at *4.

The Fifth Circuit case on which Richard Douglas relies to support his putative right—*Logan v. Hollier*, 711 F.2d 690 (5th Cir. 1983)—does not assist him with respect to the qualified immunity issue. In *Logan*, the Fifth Circuit vacated a district court's opinion and remanded the case "for the determination by the district court whether [the plaintiff] has a cognizable claim under § 1983 for the injury to her constitutionally protected liberty interest in parenthood, separate and apart from the state law created wrongful death action." 711 F.2d at 690. In the process of remanding the case, the *Logan* panel "share[d] a few observations" on the question that it posed to the district court. *Id.* at 691. These observations seem to suggest that the panel believed that the district court should endorse such a claim. *See id.*

However, observations are not conclusions of law. Despite at least one district court's conclusion to the contrary in *Guilbeaux v. City of Eunice*, No. 16-1464, 2017 WL 1305254, at *3 (W.D. La. Jan. 6, 2017) (Whitehurst, M.J.), *adopted in relevant part by* 2017 WL 889742 (W.D. La. Mar. 2, 2017) (James, J.), the Fifth Circuit's *Logan* opinion did not hold—and in fact expressly declined to hold—that a parent may bring a claim to recover damages under § 1983 for violation of a Fourteenth Amendment right to familial association and parenthood arising from the death of an adult child. *See Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 173 (5th Cir. 1985) (Garwood, J., dissenting) (observing that "whether a nondependent parent can recover under section 1983 for grief over the death" of an independent adult child "is an open question in this Circuit" and citing *Logan*).

Plaintiffs also point the Court to a slew of out-of-circuit cases that recognize a parent's ability to recover damages under § 1983 for a child's death,[63] implying that "a robust consensus of persuasive authority" demonstrates that the right asserted by Richard Douglas is clearly established. *Wyatt*, 718 F.3d at 503. Yet the circuits vary widely in how they define parents' constitutional right to recover damages for a child's death.[64] As such, the contours of a parent's putative Fourteenth Amendment right to familial association with an adult child—and ability to bring a § 1983 claims for damages where a state actor infringes on the right—are not "sufficiently clear" to label the right "clearly established" on the basis of persuasive authority. *al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640) (internal quotation marks omitted). As such, Deputies DePhillips, Kelly, and Jenkins are entitled to qualified immunity

---

[63] *See id.* ¶ 55 (citing cases).

[64] For example, the Ninth Circuit has held that "[p]arents have a Fourteenth Amendment right to the companionship of a child, which a police officer violates by 'act[ing] with a purpose to harm' the child 'that [is] unrelated to legitimate law enforcement objectives.'" *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1168-69 (9th Cir. 2013). To the Ninth Circuit, this right—which a parent may vindicate via § 1983—does not turn on the child's age, but rather on the strength of the parent-child bond. *See id.* at 1169-70. The Tenth Circuit likewise permits a parent to pursue a claim under § 1983 "for deprivation of the [Fourteenth Amendment] right to familial association" arising from an adult child's death, but the parent "must show that the state actor intended to deprive him or her of [the] specially protected familial relationship." *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1175 (10th Cir. 2013) (citing *Trujillo v. Bd. of Cty. Com'rs of Santa Fe Cty.*, 768 F.2d 1186, 1188-90 (10th Cir. 1985)).

The Seventh Circuit does not recognize a "constitutional right to recover for the loss of the companionship of an adult child when that relationship is terminated as an incidental result of state action." *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005). Conversely, the Third Circuit has held that "the fundamental guarantees of the Due Process Clause do not extend to a parent's interest in the companionship of his independent adult child." *McCurdy v. Dodd*, 352 F.3d 820, 831 (3rd Cir. 2003).

from Richard Douglas's Fourteenth Amendment claims and so those claims will be dismissed.

## B.

Plaintiffs assert *Monell* claims against the Sheriff of St. Tammany Parish for, among other things, failure to train.[65]  Under *Monell v. Department of Social Services*, municipalities and local governing bodies are subject to liability for constitutional violations involving official policies or practices.  *See* 436 U.S. 658, 690 (1978).  *Monell* claims consist of three elements: "(1) a policymaker; (2) an official policy [or custom]; and (3) a violation of constitutional rights whose 'moving force' is the policy or custom." *Davis v. Tarrant Cty, Tex.*, 565 F.3d 214, 227 (5th Cir. 2009) (citing *Rivera v. Houston Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003)).  In their complaint, plaintiffs do nothing more than articulate the elements of a *Monell* claim; they do not support those elements with factual allegations.[66]  In particular, plaintiffs identify no policy or custom of the Sheriff that resulted in a violation of anyone's constitutional rights, let alone their own.

Further, to the extent that they ground their *Monell* claims in a failure to train on the part of the Sheriff, "the Supreme Court has held that a single incident, standing alone, is usually insufficient as a matter of law to establish a failure to train violation."  *Batiste v. Theriot*, 458 Fed. App'x 351, 358 (5th Cir. 2012).  "Nowhere in

[65] *See* R. Doc. No. 25, ¶ 68.  The complaint does not specify which plaintiffs are asserting *Monell* claims against the Sheriff of St. Tammany Parish, instead treating plaintiffs as together asserting one *Monell* claim.  *See id.* ¶ 65.  The Court will construe the complaint as asserting *Monell* claims on behalf of each plaintiff.
[66] *See id.* ¶¶ 64-70.

their [complaint] do the Plaintiffs assert a pattern of incidents or incompetence on the part of the [Sheriff] which would be a prerequisite to proving a failure to train claim." *Id.* at 358-59. Therefore, the *Monell* claims will be dismissed.

Plaintiffs also assert claims against Sheriff Strain in his individual capacity.[67] (Sheriff Strain was serving as the Sheriff of St. Tammany Parish at the time that the events in this case unfolded.) To the extent that plaintiffs seek to hold Sheriff Strain responsible for the actions of his subordinates, they may not do so. It is long settled that "supervisory officials are not liable for the actions of subordinates on *any* theory of vicarious liability" under § 1983. *Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005) (quoting *Thompkins v. Belt*, 828 F.2d 298, 303 (5th Cir. 1987)) (emphasis added); *see also Thompson v. L.A. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action."). As such, "[i]n order to state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995); *see also Thompkins*, 828 F.2d at 304 (same).

The factual allegations in the complaint barely mention Sheriff Strain at all, referring to him only as one of the recipients of a letter from plaintiff's counsel in

---

[67] *See id.* ¶ 65. The complaint does not specify which plaintiffs are asserting claims against Sheriff Strain in his individual capacity, instead treating plaintiffs as together asserting one claim. *See id.* The Court will construe the complaint as asserting claims on behalf of each plaintiff against Sheriff Strain in his individual capacity.

17

which counsel made certain requests.[68]  Plaintiffs' allegation that the requests made in the letter were not honored is far from sufficient to plead that Sheriff Strain was "personally involved" in violating any plaintiffs' constitutional rights or that his actions were "causally connected" to any alleged constitutional violations.  *Woods*, 51 F.3d at 583 (5th Cir. 1995).  All claims against Sheriff Strain in his individual capacity will be dismissed.

## C.

L.C., on behalf of G.D., asserts Fourth Amendment claims for use of excessive force on behalf of Douglas against Deputies DePhillips, Kelly, and Jenkins.[69]

The excessive force claims asserted on behalf of Douglas derive solely from Deputy DePhillips's use of deadly force against Douglas.[70]  While Deputies Kelly and Jenkins did not use deadly force against Douglas, they were present at the scene, and so the Court reads the complaint as asserting bystander liability claims against them.

The Court will first address the excessive force claims asserted on behalf of Douglas against Deputy DePhillips.  The Court will then consider such claims against Deputies Kelly and Jenkins.

### i.

"Deadly force is a subset of excessive force."  *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 487 (5th Cir. 2001).  To state a Fourth Amendment excessive force claim, a plaintiff must allege "(1) an injury, (2) which resulted directly and only from the use

---

[68] *See id.* ¶ 33.
[69] *Id.* ¶ 44.
[70] *See id.* ¶¶ 43-55.

of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Manis v. Lawson*, 585 F.3d 839, 843 (5th Cir. 2009) (internal quotation marks omitted). Where death is the injury caused by the use of deadly force, the only issue for a court "is whether the use of that deadly force was unreasonable." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011).

An officer's use of deadly force "is not unreasonable when [the] officer would have reason to believe the suspect poses a threat of serious harm to the officer or others." *Id.* at 188 (quoting *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003)) (internal quotation marks omitted). A court's "primary concern" in the use-of-deadly-force context, then, is whether the officer who used force was, "[at] the moment of the shooting, reasonably trying to prevent serious injury or death." *Carnaby*, 636 F.3d at 188 n.4 (internal quotation marks omitted); *see also Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011) (observing that the inquiry is "confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]" (internal quotation marks omitted) (alterations and emphasis in original)). "If the officer reasonably believes the suspect poses a threat of serious harm, the use of deadly force is not excessive." *Guerra v. Bellino*, No. 15-51252, 2017 WL 3397430, at *3 (5th Cir. Aug. 8, 2017) (per curiam).

The U.S. Supreme Court has instructed that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."

*Graham v. Connor*, 490 U.S. 386, 396-97 (1989). "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." *Ramirez v. Knoulton*, 542 F.3d 124, 129-30 (5th Cir. 2008) (quoting *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985)) (internal quotation marks omitted). Thus "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Moreover, "[i]t is a question of objective reasonableness in light of the facts and circumstances confronting [the officer], without regard to [the officer's] underlying intent or motivation." *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382-83 (5th Cir. 2009) (internal quotation marks omitted) (alteration in original). In other words, "the proper inquiry is an *objective* one"; officers' "*subjective* beliefs" are "irrelevant." *Hudspeth v. City of Shreveport*, 270 Fed. App'x 332, 337 (5th Cir. 2008) (per curiam) (emphasis in original).

## ii.

Plaintiffs argue that the factual allegations in the complaint state an excessive force claim on behalf of Douglas against Deputy DePhillips. However, the Court need not decide this issue to determine the viability of the claim.

As the Court previously explained, plaintiffs carry the burden of demonstrating that the defense of qualified immunity does not apply. *See Club Retro*, 568 F.3d at 194 (citing *McClendon*, 305 F.3d at 323). To meet this burden, not only

must plaintiffs state a violation of a constitutional right, but plaintiffs must also show that, "at the time of the incident, the law clearly established that [the officer's] conduct would violate the [plaintiff's] right" to be free from use of deadly force. *Ontiveros*, 564 F.3d at 383 n.1. "This inquiry focuses not on the general standard—when may an officer use deadly force against a suspect?—but on the specific circumstances of the incident—could an officer have reasonably interpreted the law to conclude that the perceived threat posed by the suspect was sufficient to justify deadly force?" *Id.*

"[U]nless the violation is 'obvious,' there must be relevant case law that 'squarely governs' the situation with which the officers were presented and gives 'fair notice' that such conduct would violate the law." *Reyes v. Bridgewater*, 362 Fed. App'x 403, 408 (5th Cir. 2010) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4, 201 (2004)). More specifically, "[e]xcessive force incidents are highly fact-specific and without cases squarely on point, officers receive the protection of qualified immunity." *Ontiveros*, 564 F.3d at 383 n.1.

Yet the cases need not involve "exactly the same facts." *Reyes*, 362 Fed. App'x at 408. "The central concept is that of 'fair warning': The law can be clearly established 'despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

In this case, Douglas was "set on avoiding capture through . . . vehicular flight." *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015). After a car chase that included Douglas driving the Infiniti backwards at a "high rate of speed" in an apparent attempt to avoid capture,[71] Douglas drove the Infiniti into a ditch.[72] Douglas, as well as Sheppard, remained in the vehicle.

Deputy DePhillips left his cruiser and "positioned himself at the rear passenger door."[73] At this time, Sheppard's hands were "in the air," and Sheppard was screaming that she was pregnant.[74] Douglas "put his hand(s) near the top" of Sheppard's arms.[75] Douglas's face was "within inches" of Sheppard's face.[76] This is the scene that Deputy DePhillips confronted.

Plaintiffs have failed to point to any precedent existing as of the date of the events in this case that "placed the conclusion that [Deputy DePhillips] acted unreasonably in these circumstances beyond debate." *Id.* (internal quotation marks omitted). The cases on which plaintiffs rely in their opposition to defendants' first motion to dismiss—which plaintiffs purport to incorporate by reference in their untimely opposition to the present motion—involve excessive force claims by suspects who were handcuffed at the time that force was used against them.[77] Yet the factual allegations in the complaint show that Douglas was *not* handcuffed when Deputy

---

[71] *Id.* ¶ 14 (internal quotation marks omitted).
[72] *Id.* ¶ 15.
[73] *Id.* ¶ 18.
[74] *Id.*
[75] *Id.*
[76] *Id.* ¶ 19.
[77] *See* R. Doc. No. 17, at 20-21.

DePhillips discharged his firearm. Douglas remained free to move within the Infiniti, and "[a]s long as [Douglas] remained in [the Infiniti], he posed a potential danger to the officers and others." *Brothers v. Zoss*, 837 F.3d 513, 519 (5th Cir. 2016). After all, even a purportedly immobilized motor vehicle "can be used as a dangerous weapon." *Id.* This is to say nothing of Douglas's movements inside the Infiniti.[78]

Plaintiffs have not met their burden of demonstrating that, at the time that the events in this case occurred, "adequate authority at a sufficiently high level of specificity [ ] put [Douglas] on notice that his conduct [was] definitively unlawful." *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015); *see also Thompson*, 245 F.3d at 460 ("[I]t is the plaintiff's burden to demonstrate that all reasonable officials similarly situated would have then known that the alleged acts of the defendants violated the United States Constitution."). As such, Deputy DePhillips is entitled to qualified immunity from the excessive force claim asserted on behalf of Douglas.

### iii.

L.C., on behalf of G.D., also asserts excessive force claims on behalf of Douglas against Deputies Kelly and Jenkins. "[A]n officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). To state a bystander liability claim, a plaintiff must show that an

---

[78] As the Court understands the complaint, these movements included Douglas essentially covering Sheppard with his body, which a reasonable officer involved in Douglas's vehicular flight could have understood as threatening toward Sheppard. *See* R. Doc. No. 25, ¶¶ 18-19. Moreover, Douglas's movements allegedly gave Deputy DePhillips reason to believe that Douglas had a firearm. *See id.* ¶ 37.

officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013).

Even assuming that Deputy DePhillips's use of deadly force against Douglas amounted to constitutionally excessive force, the factual allegations illustrate that Deputies Kelly and Jenkins still cannot be held liable for this use of force under a bystander theory of liability. According to the complaint, "mere seconds" passed between the time that Deputy DePhillips exited his cruiser and the time that he discharged his firearm at Douglas.[79] The complaint further alleges that Deputy DePhillips "immediately fired" his weapon "[u]pon reaching and opening the rear passenger door."[80]

Given the alleged speed with which the incident unfolded, the factual allegations cannot be reasonably construed to support the inference that Deputies Kelly and Jenkins "acquiesced in the alleged use of excessive force." *Hale*, 45 F.3d at 919. The excessive force claims asserted on behalf of Douglas against Deputies Kelly and Jenkins are dismissed.

### D.

Sheppard, both for herself and on behalf of M.S., asserts Fourth Amendment claims for unreasonable seizure and for use of excessive force.[81] Specifically, she asserts excessive force claims against Deputies DePhillips, Kelly, and Jenkins, and

---

[79] *Id.* ¶ 12.
[80] *Id.* ¶ 37.
[81] *Id.* ¶ 61.

unreasonable seizure claims against Deputies DePhillips, Kelly, Jenkins, Graham, and Thurman, as well as Corporal Williams.[82]

### i.

As an initial matter, M.S. was *in utero* when the events in this case took place.[83] Pointing to this fact, the named law enforcement officers contend that the Court should dismiss all claims asserted on behalf of M.S. for alleged injuries[84] sustained *in utero*, because "no cause of actions exists for an alleged constitutional violation prior to birth."[85] The named law enforcement officers also assert qualified immunity.

The U.S. Supreme Court has held that the unborn do not possess Fourteenth Amendment rights. *See Whitehurst v. Wright*, 592 F.2d 834, 840 n.9 (5th Cir. 1979) (discussing *Roe v. Wade*, 410 U.S. 113, 158 (1973)).[86] "Because the unborn are not persons within the meaning of the Fourteenth Amendment, it follows that the unborn are not encompassed within the meaning of the term 'person' or 'citizen' for purposes of 42 U.S.C. § 1983." *Alexander v. Whitman*, 114 F.3d 1392, 1401 n.9 (3rd Cir. 1997) (citing *Reed v. Gardner*, 986 F.2d 1122, 1127-28 (7th Cir. 1993)); *see also An Act to*

---

[82] *Id.*

[83] *Id.* ¶ 62.

[84] The complaint alleges that Deputy Jenkins's conduct led to "a diagnosis at birth of anemia 'deemed most likely secondary to maternal fetal hemorrhage in utero' as well as cutis aplasia, amongst other injuries." *Id.*

[85] R. Doc. No. 30-1, at 22.

[86] Subsequent U.S. Supreme Court decisions have not called into question this portion of *Roe. See, e.g., Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016); *Gonzales v. Carhart*, 550 U.S. 124 (2007); *Stenberg v. Carhart*, 530 U.S. 914 (2000); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992).

*enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other Purposes*, Pub. L. No. 42-22, 17 Stat. 13 (1871) (enacting § 1983 as a means to enforce the Fourteenth Amendment).

Plaintiffs have identified no Fifth Circuit precedent holding that a child born alive may recover damages under § 1983 for injuries inflicted on the child while *in utero*. *Cf. Parks v. Harden*, 504 F.2d 861, 864 (5th Cir. 1974) ("Whatever the merits of extending *Roe*'s reach to Section 1983 actions, it is not necessary to reach that question here . . . ."), *vacated on other grounds*, 421 U.S. 926 (1975). In fact, plaintiffs and defendants agree that none exists.[87] Moreover, out-of-circuit precedent hardly settles the issue.[88]

Accordingly, even if the Court concluded that the named law enforcement officers violated M.S.'s constitutional rights, such rights would not be clearly established by either "controlling authority" or by "a robust consensus of persuasive authority." *Wyatt*, 718 F.3d at 503. The named law enforcement officers are therefore entitled to qualified immunity from any federal constitutional claims asserted on behalf of M.S.

ii.

---

[87] *See* R. Doc. No. 40, at 4; R. Doc. No. 30-1, at 23.

[88] *Compare Crumpton v. Gates*, 947 F.2d 1418, 1423 n.6 (9th Cir. 1991) ("[W]e have grave doubts . . . that infants injured *in utero* and later born alive simply must bear their federally cognizable afflictions without the hope of remedy."), *with Lewis v. Thompson*, 252 F.3d 567, 586 (2d Cir. 2001) ("*Roe*'s preclusion of a Fourteenth Amendment right for a fetus would evaporate if a child could assert a constitutional claim for prebirth injury.").

With respect to Sheppard's own excessive force claims, the complaint alleges that Deputy Jenkins "threw [Sheppard] to the ground on her stomach" when he removed Sheppard from the Infiniti after Deputy DePhillips discharged his firearm at Douglas, despite Sheppard's pregnancy being "visibly apparent." [89] According to the complaint, this action "caused severe physical and emotional injuries to" Sheppard.[90]

Accepting the factual allegations in the complaint as true and construing them in the light most favorable to plaintiffs, Deputy Jenkins is entitled to qualified immunity from Sheppard's excessive force claim. Plaintiffs have not identified any case law that clearly established at the time of the events in this case that Deputy Jenkins's conduct vis-à-vis Sheppard—urgently pulling her out of a vehicle that had just been involved in a car chase and into which an officer had just discharged his

---

[89] R. Doc. No. 25, ¶¶ 21, 23. The complaint also appears to allege that the use of handcuffs on Sheppard constituted excessive force. *See id.* ¶ 63. "To state a claim for excessive use of force, the plaintiff's asserted injury must be more than *de minimis*." *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007). "[M]inor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force." *Id.* at 417; *see also Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) (concluding that "acute contusions of the wrist" and "psychological injury from being handcuffed" is an insufficient injury to state an excessive force claim (internal quotation marks omitted)); *Glenn v. City of Tyler*, 242 F.3d 307 (5th Cir. 2001) ("[H]andcuffing too tightly, without more, does not amount to excessive force."). In this case, Sheppard does not point to any injury that resulted directly from the use of the handcuffs. *Cf. Deville v. Marcantel*, 567 F.3d 156 (5th Cir. 2009). Therefore, to the extent that she asserts an excessive force claim based on the use of handcuffs, the claim fails.

[90] R. Doc. No. 25, ¶ 62. "A plaintiff alleging an excessive force violation must show that she has suffered at least some injury." *Flores v. City of Palacios*, 381 F.3d 391, 397 (5th Cir. 2004). "While certain injuries are so slight that they will never satisfy the injury element, psychological injuries may sustain a Fourth Amendment claim." *Id.* at 397-98 (internal citation omitted).

firearm—was constitutionally unreasonable. *See Griggs v. Brewer*, 841 F.3d 308, 314-15 (5th Cir. 2016) (explaining and applying the qualified immunity standard). Similarly, plaintiffs have not identified any case law showing that Sheppard's excessive force claims against Deputies DePhillips and Kelly—which the Court reads as bystander liability claims—overcome the qualified immunity barrier.

In fact, plaintiffs discuss the excessive force issue only to the extent of explaining the general standard.[91] "In this instance, [plaintiffs] point[ ] to no authority establishing that it was unreasonable for an officer to [engage in the conduct about which she complains]." *Id.* at 315. As such, plaintiffs have wholly failed to meet their burden of demonstrating that the deputies are not entitled to qualified immunity from Sheppard's excessive force claims, and all such claims will be dismissed.

### iii.

Sheppard also asserts unreasonable seizure claims against multiple defendants, namely Deputies DePhillips, Kelly, Jenkins, Graham, and Thurman, and Corporal Williams.

"A person is 'seized' for Fourth Amendment purposes 'when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen.'" *McLin v. Ard*, 866 F.3d 682, 691 (5th Cir. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 & n.16 (1968)). A seizure occurs where, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed

---

[91] *See* R. Doc. No. 17, at 19-20.

that [they were] not free to leave." *Id.* (internal quotation marks omitted) (alteration in original). "The reasonable-person test is objective." *Id.* "Physical force is not required to effect a seizure; however, absent physical force, 'submission to the assertion of authority' is necessary." *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

The complaint generally alleges that "[r]emoving, handcuffing, and detaining [Sheppard] for the period of time that these Defendants did"—from the time that she was removed from the Infiniti until she was taken home after providing a statement—amounted to an unreasonable seizure that "did not end once any initial suspicions had been dispelled."[92] With regards to the actions of the particular defendants, the complaint alleges that Deputy Jenkins removed Sheppard from the Infiniti after Deputy DePhillips discharged his firearm at Douglas, and that either Deputy Jenkins or Deputy Graham "escorted [Sheppard] to the back seat of [Deputy Jenkins's law enforcement vehicle], handcuffed her, and seated her in the back seat . . . from where she could see the [ ] Infiniti the entire time she waited for the paramedics."[93] (In another part of the complaint, plaintiffs seems to indicate that Deputy Jenkins was the officer who took these actions.[94])

Paramedics arrived on the scene approximately twelve to fourteen minutes after Deputy DePhillips's use of deadly force against Douglas.[95] The paramedics

---

[92] R. Doc. No. 25, ¶ 23.
[93] *Id.*
[94] *See id.* ¶ 24 (noting that "Deputy Graham crossed paths with Deputy Jenkins and [Sheppard] on their way to" Deputy Jenkins's vehicle).
[95] *See* R. Doc. No. 1-1, at 2-3.

attended to Sheppard and transported Sheppard to Lakeview for medical treatment approximately thirty-four minutes after the use of deadly force. [96] Deputy Thurman "accompanied" Sheppard and the paramedics. [97] According to the complaint, Sheppard "repeatedly asked for her purse" during this period, but "no law enforcement official would give her any of her personal belongings, or allow her to leave."[98]

According to the complaint, Sheppard remained at Lakeview "against her will," but Sheppard chose to "stop[ ] receiving medical treatment rather than continue to be seized and imprisoned." [99] In any event, the complaint alleges that Corporal Williams reported to a Louisiana State Police investigator that Sheppard had been "isolated since arriving at the hospital" and that she had "not communicated with anyone else."[100]

These factual allegations do not show that either Deputy DePhillips or Deputy Kelly restrained Sheppard's liberty in any way. Because "mere presence" is not sufficient to establish liability under § 1983, Sheppard's unreasonable seizure claims against Deputies DePhillips and Kelly will be dismissed. *Jones v. Williams*, 297 F.3d 930, 939 (9th Cir. 2002); *see also Back v. Tex. Dep't of Crim. Justice Inst'l Div.*, 684 Fed. App'x 356, 359 (5th Cir. 2017) ("Without any personal involvement by those two defendants, [plaintiff's] § 1983 claims could not succeed as a matter of law.");

---

[96] R. Doc. No. 25, ¶¶ 26-27.
[97] *Id.* ¶¶ 26-27.
[98] *Id.*
[99] *Id.* ¶ 28.
[100] *Id.* (internal quotation marks omitted).

*Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action.").

Similarly, the factual allegations related to Corporal Williams only address what he allegedly told a Louisiana State Police investigator about what he knew about Sheppard's treatment at Lakeview. The allegations do not show that he was personally involved in restraining Sheppard's liberty. *See Jones*, 297 F.3d at 939; *Back*, 684 Fed. App'x at 359; *Thompson*, 709 F.2d at 382. Sheppard's unreasonable seizure claim against Corporal Williams will also be dismissed.

The Court will now turn toward the remaining three defendants against whom Sheppard asserts unreasonable seizure claims.

Defendants appear to accept the fact that Sheppard was constitutionally seized from the time that Sheppard was removed from the Infiniti until she arrived at Lakeview.[101] Therefore, the Court will consider whether Sheppard's seizure during such period was reasonable. *See McLin*, 866 F.3d at 694. If the seizure during this period of time was reasonable, then Sheppard's unreasonable seizure claims against these deputies will fail, even if Sheppard's seizure later became unreasonable. *See Jones*, 297 F.3d at 939 (noting that "personal involvement in . . . the *unlawful* act" is required to impose liability under § 1983 (emphasis added)).

A seizure "must be based on probable cause particularized with respect to that person." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 208 (5th Cir. 2009). "Probable cause exists when the totality of facts and circumstances within a police officer's

---

[101] *See* R. Doc. No. 30-1, at 18-19.

knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000) (per curiam). Defendants assert that "there was probable cause supported by articulable facts that criminal activity was afoot," but do not assert that the deputies had probable cause to arrest Sheppard.[102] Indeed, defendants do not even attempt to point to specific laws that Sheppard violated. The Court will not do defendants' work for them and speculate as to the offense(s), if any, for which probable cause existed. Accordingly, for purposes of deciding the present motion, the Court will assume that the deputies did not have probable cause to arrest Sheppard at the time.

However, an officer "can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *Turner v. Lieutenant Driver*, 848 F.3d 678, 691 (5th Cir. 2017) (internal quotation marks omitted).

> Reasonable suspicion has been described as a particularized and objective basis for suspecting the person stopped of criminal activity; to satisfy Fourth Amendment dictates, the stopping officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity. Thus, [w]hile reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop. In assessing the validity of a stop, the court considers the totality of the circumstances—the whole picture.

---

[102] *Id.* at 18.

*United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (internal quotation marks and citations omitted) (alteration in original).

An investigatory stop "that is justified at its inception may nevertheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution"—*i.e.*, if it transforms into an arrest unsupported by probable cause. *Brown v. Lynch*, 524 Fed. App'x 69, 74-75 (5th Cir. 2013) (per curiam). "There is no bright line point of distinction between an investigatory stop and an arrest." *Id.* at 75.

For example, "using some force on a suspect, pointing a weapon at a suspect, ordering a suspect to lie on the ground, and handcuffing a suspect—whether singly or in combination—do[es] not automatically convert an investigatory detention into an arrest requiring probable cause." *Turner*, 848 F.3d at 693 (quoting *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993)) (internal quotation marks omitted) (alteration removed). Moreover, "[t]here is no rigid time limitation on investigative stops." *Id.* Rather, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* (internal quotation marks omitted) (alteration in original).

Ultimately, "[w]hen determining whether an investigative [detention] amounts to an arrest, '[t]he relevant inquiry is always one of *reasonableness under the circumstances*,' which must be considered on a case-by-case basis." *Id.* (emphasis added). "[W]e determine the reasonableness of an investigative [detention] by

examining: (1) whether the officer's action of stopping the [person] was justified at its inception, and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the [detention]." *Davila v. United States*, 713 F.3d 248, 258 (5th Cir. 2013). "The relevant inquiry is whether the police were unreasonable in failing to use less intrusive procedures to safely conduct their investigation." *United States v. Preston*, 659 Fed. App'x 169, 178 (5th Cir. 2016) (quoting *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000)).

In this case, defendants assert that Sheppard "had just been a passenger in a [ ] vehicle with a stolen license plate that had been part of a dangerous high speed chase in which the threatening driver was ultimately shot by law enforcement."[103] (The complaint also states that the vehicle was stolen, but it does not indicate at what point law enforcement became aware of its pilfered status.) Based on this information, defendants argue that "there is nothing unreasonable, let alone unconstitutional, about deputies securing Ms. Sheppard and seeing to her transport to the hospital."[104]

The Court concludes that the facts and circumstances known to the deputies at the time objectively justified the investigatory detention of Sheppard as a threshold matter. The question then becomes whether Sheppard's detention transformed into an arrest requiring probable cause between the time that Deputy Jenkins and/or Deputy Graham initially detained Sheppard and the time that Sheppard arrived at Lakeview. Accepting the factual allegations in the complaint as true and construing

---

[103] R. Doc. No. 30-1, at 18.
[104] *Id.* at 19.

them in the light most favorable to plaintiffs, the Court concludes that Sheppard's detention during the relevant period—which lasted approximately forty-four minutes, most of which involved paramedics attending to Sheppard and transporting her to Lakeview[105]—did not amount to an arrest requiring probable cause.

The deputies confronted a vehicle with a stolen license plate, a vehicular flight endangering themselves and the public, a colleague's use of deadly force against the vehicle's driver at the flight's conclusion due to a perceived threat from the driver, a screaming passenger, and the potential existence of an unaccounted-for firearm in or around the vehicle.[106]  Faced with these circumstances, the deputies had "only a matter of seconds to assess the situation, formulate a plan of action, and implement it." *United States v. Sanders*, 994 F.2d 200, 207 (5th Cir. 1993).

> In so doing, [they] had to balance several competing priorities: to investigate the alleged crime and make any appropriate arrests; to prevent the commission of any additional crimes; not to infringe on the rights of [Sheppard] or any other persons who might be affected by the officer's actions or inactions; to ensure the safety of others of the general population present or nearby; and to go home in one piece at the end of [their] shift.

*Id.*

The complaint alleges that, after Deputy Jenkins removed Sheppard from the Infiniti, Deputy Jenkins and/or Deputy Graham handcuffed Sheppard and placed her in the back of a law enforcement vehicle until the paramedics arrived on the scene, a period of time lasting approximately twelve to fourteen minutes.  According to the

---

[105] *See* R. Doc. No. 25, ¶¶ 26-27.
[106] *See id.* ¶ 37 (noting that Deputy DePhillips "claimed with certainty . . . that he believed [Douglas] had a gun").

complaint, paramedics then arrived and attended to Sheppard. The complaint further alleges that, when paramedics transported Sheppard to Lakeview for further medical treatment approximately twenty to twenty-two minutes after their arrival on the scene, Deputy Thurman went along. During this period, "no law enforcement official would give [Sheppard] any of her personal belongings."[107]

Given the situation confronting the deputies as described by the complaint, the Court cannot say that the deputies' conduct vis-à-vis Sheppard was unreasonable. *Cf. Massey v. Wharton*, 477 Fed. App'x 256, 261 (5th Cir. 2012) ("Tonia Massey was handcuffed and put in the back of a police car, she claims, for two-and-a-half to three hours. There is no indication that the police were investigating her for anything. Under these circumstances, any reasonable officer should have known that Tonia Massey's seizure required probable cause, not reasonable suspicion.").

In fact, the complaint itself acknowledges that Sheppard's detention was permissible at least until "any initial suspicions had been dispelled."[108] In addition to investigating any suspicions related to Sheppard, however, law enforcement officials also had to secure the scene for their own safety and the safety of the public (including Sheppard), and accommodate Sheppard's medical needs. In the end, the deputies' conduct was "reasonably related in scope to the circumstances that justified the [detention]." *Davila*, 713 F.3d at 258; *see also United States v. Schlieve*, 159 Fed. App'x 538, 542 (5th Cir. 2005) (noting that an investigative detention "may last as

---

[107] *Id.*
[108] *Id.* ¶ 63.

long as is reasonably necessary to effectuate the purposes of the stop, including the resolution of reasonable suspicion that emerges during the stop").

Further, plaintiffs have not identified any case law to support the proposition that "it would have been apparent to a reasonable officer at the time of the alleged violation that [the deputies'] conduct violated the [Fourth] Amendment." *Whittington v. Maxwell*, 455 Fed. App'x 450, 459 (5th Cir. 2011) (quoting *Kinney v. Weaver*, 367 F.3d 337, 367 (5th Cir. 2004) (en banc)) (alterations in original in part).  To the extent that plaintiffs discuss case law relevant to the unreasonable seizure analysis at all, plaintiffs simply use the case law to define a constitutional seizure and to point out that the reasonableness standard governs the analysis.[109]  As such, plaintiffs have failed to meet their burden of demonstrating that Deputies Jenkins, Graham, and Thurman are not entitled to qualified immunity.  *Club Retro*, 568 F.3d at 194 (citing *McClendon*, 305 F.3d at 323) (noting that a plaintiff carries the burden of showing that qualified immunity is inapplicable).  Sheppard's unreasonable seizure claims against Deputies Jenkins, Graham, and Thurman will be dismissed.

## E.

L.C., on behalf of G.D., also asserts a Fourteenth Amendment claim for failure to render medical care to Douglas against Deputies DePhillips, Kelly, Jenkins, and Graham, as well as Sargent Dantaghan.[110]  In response, defendants argue that the

---

[109] *See* R. Doc. No. 17, at 21-22.  The Court observes that plaintiffs only discuss this case law in their opposition to defendants' first motion to dismiss, which, as previously explained, plaintiffs purport to incorporate by reference in their untimely opposition to the present motion.

[110] R. Doc. No. 25 ¶ 57.

complaint does not state a claim for failure to render medical care and that, regardless, they are entitled to qualified immunity.[111]

### i.

Pretrial detainees possess certain constitutional rights derived from the Due Process Clause of the Fourteenth Amendment, including the right "not to have their serious medical needs met with deliberate indifference on the part of the confining officials." *Thompson*, 245 F.3d at 457; *see also Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (same). The Fifth Circuit has held that arrestees are a "subset of pretrial detainees." *Nerren v. Livingston Police Dep't*, 86 F.3d 469, 472-73 (5th Cir. 1996). Unsurprisingly, then, "[a]n arrestee's complaint for denial of substantive due process and a pretrial detainee's complaint for denial of substantive due process"—including denial of medical care—"are evaluated under the same standards." *Id.* at 472; *see also id.* at 473 ("After the initial incidents of a seizure have concluded and an individual is being detained by police officials but has yet to be booked, an arrestee's right to medical attention, like that of a pretrial detainee, derives from the Fourteenth Amendment.").

An arrestee's constitutional right to medical care is violated where "an officer acts with deliberate indifference to a substantial risk of serious medical harm and resulting injuries." *Mace*, 333 F.3d at 625. This standard "encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind." *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997). Deliberate indifference

---

[111] *See* R. Doc. No. 30-1, at 23-25.

"cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Estate of Allison v. Wansley*, 524 Fed. App'x 963, 971 (5th Cir. 2013) (per curiam); *see also Mace,* 333 F.3d at 626 ("Mere negligence or a failure to act reasonably is not enough.") The official must be "actually aware of the risk, yet consciously disregard[ ] it." *Zimmerman v. Cutler*, 657 Fed. App'x 340, 348 (5th Cir. 2016) (quoting *Lawson v. Dallas Cty.*, 286 F.3d 257, 262 (5th Cir. 2002)) (internal quotation marks omitted). In other words, "[t]he officer must have the subjective intent to cause harm." *Mace*, 333 F.3d at 626.

To satisfy the requirement of subjective deliberate indifference, L.C. must allege facts that—if true—would show "(1) that each defendant had subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn, (2) that each defendant actually drew that inference; and (3) that each defendant's response to the risk indicates that [each defendant] subjectively intended that harm occur." *Tamez v. Manthey*, 589 F.3d 764, 770 (5th Cir. 2009). It goes without saying that "[d]eliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001).

### ii.

In this case, even if the Court assumed that plaintiffs' factual allegations satisfy the first two prongs of the subjective deliberate indifference standard, plaintiffs' allegations fail as to the third prong.

The complaint does not allege facts to show "that each defendant's response to the risk indicates that [each defendant] subjectively intended that harm occur."

*Tamez*, 589 F.3d at 770.  Plaintiffs point to several entries in the "Event History Details"[112]—which is incorporated into the complaint[113]—that they read to suggest that the medical care defendants did not call paramedics until twelve minutes after Douglas had been shot, and then only to provide care to Sheppard, not Douglas.[114]

However, the Court cannot reasonably construe the "Event History Details" to conform to plaintiffs' understanding of the timeline of events.  The entries illustrate that Deputy DePhillips's use of his firearm was reported to the St. Tammany Parish Sheriff's Office at the time that the use occurred (5:12 pm: "SHOTS FIRED") and that paramedics then began preparing to come out to the scene (5:13 pm: "UNIFIRE STAGING"; 5:14 pm: "DO NOT ROLL EMS IN YET . . . 10-4 THEY ARE STAGING).[115]  *Cf. Batiste*, 458 Fed. App'x at 356 ("The records show that [the officers] called for an ambulance to be dispatched a mere two minutes after the tasing . . . .").  The entries go on to show that paramedics were *arriving* on the scene—not leaving *for* the scene—twelve to fourteen minutes later (5:24 pm: "RADIO THAT EMS IS ROLLING IN"; 5:25 pm: "REQ WHERE IS EMS GOING"; 5:26 pm: "HAVE EMS COME TO TAPE LINE").[116]

As the Court previously explained, deliberate indifference "cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."  *Estate of Allison*, 524 Fed. App'x at 971.  At *most*, plaintiffs' factual

---

[112] *See* R. Doc. No. 1-1.
[113] *See* R. Doc. No. 25, at 9 n.5.
[114] *Id.* ¶ 59.
[115] R. Doc. No. 1-1 at 2.
[116] *Id.* at 3.

allegations *may* show negligent or grossly negligent conduct—not deliberate indifference.

Finally, even assuming that the complaint stated deliberate indifference claims, the defendants would nonetheless be entitled to qualified immunity. Plaintiffs only discuss relevant case law in their opposition to defendants' first motion to dismiss. In that opposition, plaintiffs do nothing more with this case law than point out the existence of the claim and explain the basic standard governing the claim, *i.e.*, deliberate indifference.[117] Plaintiffs point to no cases to support their contention that the challenged conduct was objectively unreasonable under clearly established law. *See Michalik*, 422 F.3d at 258. Plaintiffs have failed to meet their burden of showing that "all reasonable officials in the [defendants'] circumstances would have then known that [their] conduct violated [Douglas's] rights." *Carroll*, 800 F.3d at 169; *see also Club Retro*, 568 F.3d at 194 (citing *McClendon*, 305 F.3d at 323) (observing that the plaintiff carries the burden of defeating the defense of qualified immunity). The Court will therefore dismiss the failure to render medical care claims asserted on behalf of Douglas against Deputies DePhillips, Kelly, Jenkins, and Graham, as well as Sargent Dantaghan.

## V.

Having concluded that all of plaintiffs' federal law claims should be dismissed, all that remains in the case are plaintiffs' claims under Louisiana law.[118] Under Title

---

[117] R. Doc. No. 17, at 22.

[118] The complaint asserts wrongful death claims under Louisiana law. *See* R. Doc. No. 25, at 33. Plaintiffs do not purport to assert these claims under § 1983 and thus

28, United States Code, § 1367, district courts may decline to exercise supplemental jurisdiction over a state law claim if:

> (1) the claim raises a novel or complex issue of State law,

> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> (3) the district court has dismissed all claims over which it has original jurisdiction, or

> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). In addition to these factors, the Fifth Circuit has instructed district courts to also consider the common law factors of "judicial economy, convenience, fairness, and comity" in reaching its decision. *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008). "These interests are to be considered on a case-by-case basis, and no single factor is dispositive." *Id.*

These factors weigh in favor of dismissal without prejudice of the Louisiana law claims so that plaintiffs can assert those claims in Louisiana state court. The Court has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Moreover, allowing Louisiana's courts to rule on Louisiana law claims "encourages fairness between the parties by procuring for them a surer-footed

---

the Court does not treat them as doing so. *Cf. Batiste v. Theriot*, 458 Fed. App'x 351, 357 (5th Cir. 2012). Moreover, the Court has held that Deputies Jenkins and Kelly cannot be held liable for Deputy DePhillips's use of deadly force against Douglas, and that Deputy DePhillips is entitled to qualified immunity from the excessive force claim asserted against him on behalf of Douglas. Therefore, as related to the wrongful death claims, the Court has dismissed "all of the federal questions that gave it original jurisdiction." *Rhyne v. Henderson Cty.*, 973 F.2d 386, 395 (5th Cir. 1992).

reading of applicable law." *Bitte v. EMC Mortgage Corp.*, No. 07-9273, 2009 WL 1950911, at *2 (E.D. La. July 1, 2009) (Africk, J.) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966)) (internal quotation marks omitted). Further, "deference in this case with respect to the state law issue[s] promotes the important interest of comity to state courts." *Id.* Finally, the parties will not be unduly prejudiced by the Court declining to exercise supplemental jurisdiction, as the litigation is still in its early stages.

## VI.

For the foregoing reasons,

**IT IS ORDERED** that defendants' motion to dismiss is **GRANTED**.

**IT IS FURTHER ORDERED** that all federal law claims are **DISMISSED WITH PREJUDICE** and that all state law claims are **DISMISSED WITHOUT PREJUDICE** pursuant to Title 28, United States Code, § 1367.

New Orleans, Louisiana, October 13, 2017.

_____

**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**

## APPENDIX



Map data © 2017 Google